Good morning, Your Honor. May it please the Court, Joel Anderson for C.H. Robinson Worldwide, Inc. May it please the Counsel, I'm going to address the cross motions for summary judgment first, and then the motion to dismiss Mr. Peacock voluntarily dismissed with prejudice second, if that's okay. The appeal of the cross summary judgment motions rests on three non-controversial points of Minnesota state law governed by published Minnesota state court authority. One is that an employer may contractually prohibit a former employee from deflecting customers to a competitor. The second is that mandatory contractual severability is a different beast than discretionary contractual reformation or blue penciling, different concepts. And the third is that a Minnesota court or a court applying Minnesota state law must apply contractual severability clauses. Counsel, let me ask you about that. Under Minnesota severance law, was the district court required to sever parts of the same provision? Here we have, for example, the non-solicitation provision. They're both, they're not two different provisions that are in question. We have section 4C3 and 4C1. Yes, Your Honor. Does Minnesota law require the severance of portions of a restrictive covenant? Let me start with Minnesota law says the court must follow what the parties agreed. So let me start with the language of the contract here, which says what the parties agreed to. And the parties agreed, the covenants contained in this agreement are intended to be separate and divisible. It's our position that the covenant in section 4C1 is a separate and divisible covenant in section 4C3. And there is no Minnesota law that supports a holding that, well, if separate covenants, when the contract says separate covenants are separate, if the separate covenants are similar or if they feel the same, then I, then the court can't sever it. So each subsection is a separate covenant? Correct. And if the contract, instead of saying section 4C1 and 4C3 had had different numberings, I don't think that the court would be applying a different analysis. You look at the language of the covenants themselves. And the language of the covenants in section C1 and C3 are different. They protect different things. Let me follow up. So one of the natural extension of that question is within a single covenant, so within just one. So it says directly or indirectly, and one of the verbs used is render services, and the object here is a business partner. And so this is incredibly broad. At least if I were interpreting it according to its plain language, if one of these employees was working for a competitor, and let's say UPS was a business partner, they decided to schedule delivery for UPS, they are rendering services to or engaging or selling or whatever directly or indirectly with UPS. So I don't see how, honestly, I don't see how an employee could possibly work for a competitor without violating this under the plain language of the provision. Okay. The question really is about the enforceability of section C1 under Minnesota state law. And it's our position that the restriction that's in section 4C1 is more narrow than the restrictions that have been applied and enforced by many, many Minnesota state courts, and in fact this court in Prowl v. Medtronic. So this court and appellees and the district court can have problems with the language of the agreement and not like it and think it's too broad, but the job here is to apply Minnesota state court law, and if there's not a Minnesota state court law on point, then to determine what Minnesota state court law would say. But generally there's, and I didn't have a lot of these cases when I was on the state Supreme Court. I remember seeing them. But there's also the principle that you've got to let somebody be able to work for a living as well. That's sort of an underlying principle. And if, you know, somebody has worked with UPS in the prior job and needs to work with UPS in the subsequent job, heck, I'm not even sure it would just apply to a competitor. You know, our judicial assistants send things through UPS. And so my point is if it keeps somebody, why shouldn't we give it its plain language? Because that's what Minnesota state courts have done in the past with broader provisions. And if this provision is more narrow than what Minnesota state courts have enforced already, then the Minnesota, in a court applying Minnesota law, has no choice but to. . . What's your most similar case? Well, I've got five for you, Your Honor. Offside v. Larson said that the employee could not promote the sale or do sales to any customer, not just customers the individual worked with, not just customers the individual learned information about, all customers in a territory. Cherney prohibited the rendering of services to any customer upon whom the person called on or whose account he supervised. So in Cherney, the individual was prohibited from rendering services to customers that he didn't even interact with at Cherney. He could have supervised someone else. Isn't that narrower, though? Because customers, I know it uses broader language, but my biggest problem is with the definitions, which is business partners, which includes, like, everybody that the company ever interacted with, at least that's how I read it. And so is that really, is that case really narrower? Or, I mean, broader, excuse me? The provision in that case. Sure. I believe it is because the definitions of business partner as applied through Section C-1 are limited. So Section C-3 doesn't have the same limitations that C-1 does, and it's business partners with whom the individual had business contact or had access to confidential information. To go back to Judge Bennett's question, Prowl v. Medtronic prohibited the attempting to divert by soliciting any customer, again, with whom he worked or you supervised. Creative Communications v. Gaylord prohibited soliciting or servicing any client of the employer. And Web Publishing, sort of a seminal non-solicit case in Minnesota, said that you couldn't prohibit, that the person was prohibited from soliciting any customer of the employee, employer, I'm sorry. I think another way to look at this when applying Minnesota non-compete law and having a court potentially take a narrower view of a provision that has been enforced more broadly by other courts is to say, Minnesota legislature and governor know how to limit restricted covenants in Minnesota. Minnesota banned non-competes a few years ago. And in that statutory non-compete ban, the legislature, signed by the governor, said customer non-solicits are okay. So you have the state of Minnesota proclaiming that customer non-solicits are okay. And as we sit here today, the Minnesota legislature is meeting in conference committee to try to pass a change to that non-compete ban. The legislature knows how to do this, and it chose to permit specifically and expressly permit customer non-solicits. In terms of how the Minnesota Supreme Court would view this, wouldn't they be concerned that your approach would encourage employers to draft overly broad employment restrictions and then force the courts to engage in a severance puzzle? That concern may exist. If it has existed, it hasn't come up in courts that have applied severability clauses to restricted covenants. And our brief cites several courts that have done that. Minnesota state courts, I think they were unpublished, I admit, but there are several Minnesota district court cases that have done that. I'm not, and CH Robinson is not promoting a position that appellees don't agree with. If you look on page 27 of their brief, appellees admit that contractual severing applies to restricted covenant agreements. The argument is simply, well, these covenants are too similar, so you can't sever one and leave the other intact. And it's our position that unless there's some Minnesota state court that says basic contract law on severing shouldn't apply to certain sorts of restricted covenants, then a court applying Minnesota state law has to sever a severable provision. So you said that blue penciling is different, and I agree with that. You know, I think you made a good point about three versus one, but could you actually sever individual language within one? Suppose we were to find that one aspect of it was too broad. Could you just draw a pencil through that, or does the entirety of one stand or fall on its own? I think it's the entirety, and I think the language of the agreement gets to that, and I think case law going back a long time on contract severability under Minnesota state law would say it applies to an entire A provision, and it's our position that C-1 is a provision and C-3 is a provision. It's not just our position. It's the party's agreed upon position because that's what they agreed in the agreement. Unless the Court has further questions, I'm going to reserve the room. And you may. Thank you. You may. Mr. Bain. May it please the Court. My name is Lucas Baining, and I represent the appellees in this matter. May it please the opposing counsel as well. C.H. Robinson would like to be able to usurp the Court's equitable discretion to judicially modify overbroad restrictive covenants and effectively require courts to do its dirty work and clean up overbroad contracts that it has repeatedly thrusted upon employees over and over and over again. But your clients, I mean, ultimately, I know it's maybe a contract of adhesion, but they agreed to it, right? I mean, they agreed to a severance provision that allows them to do exactly that. Agreed to the extent that they signed the contract, and there's lots of facts as to the circumstances of that contract. But I want to go to the origination of this Blue Pencil Judicial Modification Doctrine to discuss why that severance provision is not enforceable as they're seeking to have it be enforced here. It is not automatic. So I'll go right to that. And so this is not a regular business contract. We're not dealing with two sophisticated entities that entered into some sort of like a real estate contract and agreed to severance. We are dealing with an inherently unequal bargaining power between an employer and an employee, and that has been long recognized in Minnesota Supreme Court case law, specifically in Mentor, which is cited in our brief. The Court explained, So the courts have always been very acutely aware of this inherent disparity in bargaining power. When you have an employer of C.H. Robinson, Fortune 100 Company, that can put anything into these contracts, have the employees sign them,     and effectively sign away their protections as Minnesota citizens to not be subjected to overbroad restrictive covenants. And so there's a public policy reason why this severance provision shouldn't be enforced or shouldn't be followed or shouldn't be required to be followed in a non-compete. And that's because these employees, let's say there's a severance provision as it is here, they don't know what the court is going to decide is severable or what the court is going to decide is enforceable. And we have an extremely, as you recognize, Judge Strauss, an extremely overbroad contract that covers practically everything they could possibly do for a competitor and even many entities that aren't actual competitors of C.H. Robinson. You look at their definition of competing business, and it includes shippers and buyers of produce. So grocery stores, I mean, these sorts of restrictions are extremely overbroad. And because there's a severance, if the court were required to apply severance or required to blue pencil based on a contractual agreement, they would have no idea throughout their entire course of employment until they get to the very end of the case where the court finally issues a decision as to what's severable, what's fair, what's actually protects the company's legitimate business interests. I think that's a problem. But I do think that opposing counsel has a point, which is contractual severance provisions are generally enforceable. It may be a different issue as to the scope of the non-solicitation, but at least as to severance provisions are generally enforceable. Well, and I'll say this. You don't even really have to get to severance here. They've conceded that they're only they think C.1.3, 4, C.1. Section 4.C.1 has to stand on its own, and it doesn't. I mean, you can read it. You've noted the overbreath of it. It has all sorts of problems with it. So even if we were to assume without deciding that the severance was required to be followed, it's still overbroad, and the district court's decision can be affirmed on that basis. But I want to get to my second reason why that severance, requiring a court to follow severance, is problematic and is actually not supported in the case law. And it goes back to Bess v. Bothman, and that's the original case from the Minnesota Supreme Court where it kind of adopted this approach where you can partially enforce an overbroad illegal restraint of trade. So let's imagine for a moment there was no severance provision at all, and there was no blue pencil provision. There was nothing in the contract on this. Everybody would have to agree, I think C.H. Robinson would even agree, whether to make alterations to the contract would be purely discretionary. It would be a function of the court's equitable powers as to do equity. And that comes from Bess v. Bothman. And in that case, the court was considering a range of different approaches to modifying noncompetes, overbroad noncompetes. And it said in some cases, some States, it did a little bit of a survey and said in some States, in order to modify an overbroad nonsolicitation, overbroad noncompete, the language needs to be grammatically severable. It needs to be severed. Other States allow for a little bit more leeway. It's more of a blue penciling approach. It's not just grammatically severable, but we can make little changes. We can change two years to one year or six months. We can make changes to the geographic scope. And the court did a survey of options, and it said, you know what? We're going to go with the one that gives a little more leeway. We don't really see a reason, a good reason, to restrict the ability of the courts to exercise its equitable discretion here. And so we're going to use the blue pencil approach. And in doing so, the court specifically stated that any concerns about blue penciling and any concerns about the approach that it was taking is kind of the underlying principle still would stand that enforcement, and this is a direct quote, enforcement of restrictive covenants remains a matter of equitable discretion and should be granted only when neither injury to the public interest nor injustice to the parties will result. So even when a court is enforcing a severability clause, they're performing an equitable function in this context? In this context, yes. And I'll say that the fact that there is a severability clause is certainly something the court can consider in deciding whether injury to the public interest or injustice to the parties will result. But Besh v. Bothman does not create an exception, and there is no created exception by any case where it says it's normally equitable, but if there's a contract provision, it's not equitable, and the court loses its equitable powers. And I want to be very, very clear. C.H. Robinson is not challenging the district court's ultimate conclusion that severance would be wholly inequitable here. I mean, the district court said right in its order, to allow CHR the benefit of overly broad restriction on its employees at the front end and then revise those restrictions into something more reasonable to capture specific breaching conduct on the back end is both unfair and anathema to the balancing interests under Bennett. They're not challenging that. They're not challenging that it would be wholly inequitable to sever and enforce and surgically enforce to catch this specific breaching conduct. Instead, they're claiming there is no equitable discretion. But that has also been rejected by the Minnesota Supreme Court in a different context. And I'll point the court to St. Jude Medical, Inc. v. Carter. This is a Minnesota Supreme Court case, 2018. I think it was after your time on the bench. 913 Northwest 2nd, 678. There, the parties had an agreement that if a breach of a noncompete occurred, injunctive relief was mandatory. That's a little bit different, though, because it specifically required injunctive relief, which is clearly equitable. Yes. I agree that it is a different context, but the principles are the same. Blue penciling modification under Best v. Boffman, it's an equitable power that the court has and should only be issued in equitable circumstances. And the court was extremely clear. I mean, obviously, the holding was based on the language of the contract, but the court was extremely clear in its language. The decision to exercise equitable powers belongs to the court. Those powers are not deployed based solely on the language of a private agreement because parties do not have the capacity to direct the court's exercise of equitable powers. And where would it end? I mean, truly, if we've said severability must be enforced in these agreements that are highly disfavored, where would it end? Could they put a contract provision in that says, well, if you win on summary judgment, you go up to the Eighth Circuit, the Eighth Circuit will chastise your attorney publicly. Would you be required to do that? I mean, I welcome it. I would welcome the public chastisement, but you wouldn't be required. So there is an end to the sorts of language you can put in a contract that attempts to usurp the court's equitable powers. So all of that to say, frankly, you don't need to reach the severance issue because it's overbroad even if you sever C-1-3 and only look at C-1 or Section 4C-1. And this is based on those definitions that Your Honor was looking at earlier. For example, I mean, this provision contains definitions that normally would reduce or would kind of limit the scope of these provisions in an ordinary non-compete. That's kind of what you see is competing business is defined really narrowly so the parties are aware of what the issues will be. But here, for instance, competing business has a four-part definition that includes all businesses that are engaged in or is about to become engaged in a business or businesses the same or similar to the company businesses, which is separately, company businesses is separately defined to include other businesses the company may become involved in now or in the future. So at some point in the future. And then it also includes the sale and sourcing of fresh fruits and vegetables. That's who C.H. Robinson is claiming they're competing with, grocery stores. They're competing with farms. They're competing with all these other entities that are completely unrelated to what the employees were doing for C.H. Robinson. What about, so, you know, it's easy to get confused between one and three, but it says that, I mean, business partner and competing business are quite broad, but it says with whom I worked or had regular contact, on whose account I worked, or with respect to which I had confidential information. Some of these like future people, right, future businesses, probably would not be people that these employees work with because they're not in the business yet. Yeah, and I want to focus, you bring up an excellent point as to what's the overbroad, there's overbreath even within those limiting phrases, and I want to focus on confidential information and access to confidential information. And I do want to be clear, there is no defined bright line rule that says employers have an automatic right to restrict an employee from contacting every single customer. In fact, that's been rejected. Webb v. Fossage, which they rely on quite frequently, it wasn't every single customer, it was actually only the customers of a very small division within that company, and that was a company that he was integral to and was, it's a very, very limited amount of customers that were covered there. So that case doesn't support their provision, doesn't support their argument. But I think it's Prowl v. Medtronic, the court specifically noted that it wasn't overbroad because it's limited to the customers they had contact with, so that doesn't support their provision. And I believe the last one is Mentor Clothing v. Brock. That one supports our provision. That's a clothing salesman who didn't develop goodwill or relationships with any of the people walking off the street, so that would give rise to a protectable interest. So we have the same thing here, though? I mean, you're going over these cases. Don't we arguably have the same thing here where if, I don't know, think of a competitor, some trucking company. If they never had any contact with the trucking company, then potentially provision one would be construed narrowly, and they'd be able to work for that competitor. No, because this definition of confidential information. So confidential information, and this is on page 54 of the appendix, the definition of confidential information that CHR included in this contract includes all information relating to any aspect of the company business which is not generally known or which is prioritary to the company, and it further is defined to expressly include all information contained on any computer or computer system of CH Robinson. So if they have any identification of any of their customers, which they're going to have on all of their computer systems, if it's a customer, a prospective customer, a carrier, a vendor, it's going to be on the computer system. So they're all covered. That limiting phrase actually balloons the scope because of the way that they defined it. So there is no path to this only covering specific customers they worked with if that language is going to stay in there. That language effectively blows up the entire provision to mean it's every single customer, it's every single vendor, it's every single consultant, it's everything because it's everything that's on their computer system. Your argument is the confidential information is like a catch-all that just brings everything in. Yes. I mean, it does, and then there's obviously the issues with the definitions of competing business and business partner that are extremely broad, and the results are that these individual defendants weren't able to really do anything for a competing business or for many other businesses. I mean, they can't go, if they work for a competing business, can they even go to the grocery store? I mean, is that going to result in a breach? If they work for a competing business, can they buy plane tickets from Delta because Delta is a vendor that C.H. Robinson used? I mean, these sorts of situations, the breach in conduct is immense, and that's part of the reason it's drafted that way is so that C.H. Robinson can claim pretty much anything as a breach and then do what it's doing here and walk it back and say, well, we're only really concerned about these 13 or 15 or however many customers it is that they find out in discovery. That's not a situation where the court should exercise its equitable discretion. And so on that point, my time is coming to an end. I'll also just note that the motion for voluntary dismissal was properly denied. The case was set for summary judgment. It was under a remand order to issue that decision, and I thank you for your time. Thank you for the argument. Mr. Anderson. Your Honors, it sounds like Capelli's wished to have this court create a new public policy exception to mandatory contract severability. It's not this job's court to create new public policy exceptions under Minnesota state law, so the court should reject that request. I want to step back and think about unfairness. I heard a lot about unfairness to these individuals. Traffic Tech specifically hired these individuals because they were experienced salespeople and said, come here, solicit customers that you worked with, we got it covered. There's been no suggestion anywhere in this long history of this case that had the individuals known something different about how CH Robinson would enforce the agreement or how the court would enforce the agreement, that their behavior would have been different at all. They were going to do exactly the same thing, and they were going to have Traffic Tech pay for the outcome. I want to talk about BESS. We heard a lot about BESS. Well, Hartford decision that talked about contract severability was decided, I think, in 1938, and then Allside, which applied severability, was decided after BESS. So BESS exists, but it falls in between this longstanding Minnesota case law that contract severability applies to all contracts. What about, I just want to make sure you get there, confidential information? Opposing counsel says that's the key to unlocking the breadth of this provision. Let me say, I'll answer that in a few ways. First is, I don't believe that Minnesota law, when applying restrict covenants, says to the court, court, hunt and peck through an agreement, try to find some provision that seems unreasonable, that's not even actually an issue in this case or in the dispute, and if it's unreasonable, don't enforce. That's effectively what they're asking, and that's what the district court did here. But with respect to the provision itself, again, if you just look at Minnesota state court appellate decisions that have enforced restrict covenants and look at the language of those covenants, this covenant, even with that confidential information definition, is right in line with those. Do you agree that it's as broad as opposing counsel makes it out to be, or do you think it's narrower? I think it's narrower. I don't have time to dive into the language of it. But in our reply brief, I think on pages 4 and 5, we explain that Minnesota courts have enforced covenants even when employees only had access to confidential information, not that they even saw it. Let me quickly address the motion to dismiss, with prejudice against Mr. Peacock and Traffic Tech, the related tort claim against them. Appellees didn't respond to any of our arguments that the district court made erroneous factual findings to reach its discretionary decision. So those arguments remain unrebutted. The law, in fact, did change in the midst of all this through the new California statute, and it's not just my conclusion that the law changed C.H. Robinson's calculus. It was Appellee's counsel's conclusion as well. It's not in the appendix, unfortunately, but in the briefing below, there's a Pamela Bachte declaration from March 7, 2024, that attaches counsel's back-and-forth emails on the issue, and there was a specific threat by Appellee, Mr. Peacock's counsel, that they were going to sue C.H. Robinson under this new statute. That was a new event. There's no, quote, imminent decision on the merits principle in dismissal. It just doesn't exist. They pull some language from a North Carolina district court case that really doesn't rely on any analysis. And then finally, it feels like Judge Menendez's entire decision was based on some entitlement that Mr. Peacock had to a decision on the merits. First response is that exists in every case where dismissal with prejudice is asked for, and second, there's no judicial or there's no legal support for that as being a factor here. My time has expired. I thank you. Thank you for the opportunity.